OPINION OF THE COURT
 

 Alexander, J.
 

 The respondent Planning Board of the Town of Lloyd denied petitioner WEOK Broadcasting Corporation’s application for site plan approval to construct a radio transmitter facility.
 
 *377
 
 After a review of the application pursuant to SEQRA, the Planning Board determined that petitioner "failfed] to adequately minimize or avoid adverse environmental effects to the maximum extent practicable” and that "the environmental effects [identified] in the Environmental Impact Statement process cannot be adequately minimized or avoided by the mitigation measures identified as practical.” The Planning Board now appeals pursuant to CPLR 5601 (a) from an order of the Appellate Division which affirmed Supreme Court’s judgment annulling the Board’s determination as not supported by substantial evidence. We agree with the Appellate Division’s determination and therefore, for the reasons that follow, the order appealed from should be affirmed.
 

 I
 

 In July 1988, WEOK Broadcasting Corporation (WEOK) submitted an application to the Planning Board of the Town of Lloyd (Board) for site plan approval to build an AM radio transmitter facility consisting of five radio towers in Ulster County. The site is located in a Designed Business zone which allows radio and television towers as a permitted use, subject only to site plan approval by the Planning Board (Town of Lloyd Zoning Ordinance § 100-21 [A] [3]).
 

 Nine months later in April of 1989, the Board issued a positive declaration that the project "may have a significant effect on the environment” (ECL 8-0109 [2]). Thus, concerned that the project threatened to impair the environment, the Board directed petitioner to file an Environmental Impact Statement (EIS) which would consider, among other things, the towers’ visual impact from nine locations, one of which was the Franklin D. Roosevelt residence, a national historic landmark in Dutchess County. Petitioner prepared and submitted a comprehensive Draft Environmental Impact Statement (DEIS) which included an analysis, prepared by landscape architects, of the visual impact of the proposed towers from these viewpoints. The analysis concluded there would be minor visual impact from six of the identified viewpoints, moderate visual impact from one, and no visual impact from the remaining two viewpoints, the Franklin D. Roosevelt (FDR) home and the Mid-Hudson Bridge. The visual impact analysis from the FDR viewpoint was conducted in the spring of 1989 when the trees surrounding the proposed site were leafless.
 

 
 *378
 
 Comment regarding the DEIS was sought and obtained by the Board from various other agencies, including the United States Department of the Interior, the Dutchess County Department of Planning and the Ulster County Planning Board. Comment was also sought from a variety of environmental conservation and historical preservation organizations. Negative comments received from the agencies, organizations and local residents focused on the potential visual impact of the towers from the FDR viewpoint.
 

 The Board also retained an independent consultant to critique the DEIS. This consultant noted that petitioner had "prepared an in depth analysis which utilized a professional and thorough methodology to objectively assess the visual impact of [the proposed project].” The consultant cautioned, however, that "subjective judgments are inextricably involved in any visual assessment.”
 

 A Final EIS (FEIS) was prepared by petitioner addressing the comments and specific concerns identified by respondent’s consultant as well as other negative public comments made in response to the DEIS. The FEIS indicated that in an effort to mitigate the effect of the towers and their lighting, petitioner, with the approval of the Federal Communications Commission (FCC), substantially reduced the height of the tallest tower from an optimum height of 445 feet to 245 feet, the minimum height that would meet FCC minimum efficiency standards. In commenting upon this effort, the consultant noted that petitioner was "obviously compromising by reducing tower heights to such an extent.” In further mitigation of the objections articulated in the comments on the DEIS, petitioner noted that a variance from the Federal Aviation Administration had been obtained, permitting a reduction in the number of towers required to be lighted from five to two, and allowing petitioner to paint three of the towers gray to minimize their visibility. Additionally, the lighting on the towers was changed from a white strobe to a less visible red and in order to minimize the visual effect of the towers and to blend them in with the surroundings, they were designed as guyed towers with an 18-inch open face lattice instead of self-supporting towers tapering from an 18- to 20-foot base to two to three feet at the top.
 

 The Board denied site plan approval in December 1989. It cited,
 
 inter alia,
 
 the following reasons for the denial: the Visual Impact Statement was unpersuasive in its analysis and was subject to conflicting interpretations and conclusions;
 
 *379
 
 there was a possibility that the towers would be visible from the FDR homestead; there was no direct financial benefit to be derived by the Town of Lloyd from the construction of the towers; the proposed action would be in "sharp contrast with the orderly development of the area and the district in which the proposed towers will be located, and therefore violates criteria set forth in section 100-8.2 of Zoning Ordinance”; because local property owners found the lighting objectionable, the towers would be incompatible with section 100-13 of the Zoning Ordinance; the height of the towers, in excess of 200 feet, could not be mitigated further without limiting or eliminating the towers’ functions; and, approval of petitioner’s application might create a precedent for future development of this type, threatening the ability of the area to develop as envisioned by the existing Master Plan.
 

 This CPLR article 78 proceeding challenging the Board’s determination followed. Petitioner alleged that the Board’s determination was not supported by substantial evidence and was in fact contrary to a determination made by the Town of Lloyd Zoning Board of Appeals earlier that year in a SEQRA review, in which the Planning Board concurred, approving another transmission tower project known as the Walker Tower. The Walker Tower project involved the construction of a 400-foot-high FM radio transmission tower and accessory building at the southerly end of Illinois mountain in the Town of Lloyd which tower could be seen from both the FDR home and the Hudson River and in respect to which a special use permit was required.
 

 Supreme Court annulled respondent’s determination and granted petitioner’s application for site plan approval. That court found "nothing in the record other than generalized complaints voiced at the public hearings * * * contradicted [the report of the Town’s consultant] or WEOK’s visual study.” The Appellate Division, with two Justices dissenting, affirmed. That court noted that both parties acknowledged that respondent’s denial of petitioner’s application was based on aesthetic reasons alone and concluded,
 
 inter alia,
 
 that "[w]hile petitioner’s ElSes demonstrated that it minimized negative visual impacts to the greatest extent practical, respondent failed to furnish any rationale for completely disregarding petitioner’s comprehensive and extensive visual impact analysis” and that "[a]s the only apparent grounds for denying petitioner’s application consisted of generalized community objections, which are contrary to the data provided,
 
 *380
 
 respondent’s determination lacks a substantial evidence basis in the record” (165 AD2d 578, 581-582).
 

 The dissenting Justices would have dismissed the petition, noting that "aesthetic impact is a proper and valid basis for environmental review” and finding that respondent "expressed] cogent reasons for not giving conclusive weight to the study, reasons which were not overcome by petitioner’s responses to comments on the study contained in the final environmental impact statement”
 
 (id,.,
 
 at 582, 584). Thus, the dissenters would find the determination supported by substantial evidence. Although the majority at the Appellate Division did not reach the issue of the prior approval of the Walker Tower project, the dissenters concluded that "the facts and circumstances of the earlier project were so completely dissimilar to the instant application as to not constitute a prior precedent requiring either approval of petitioner’s application by respondent or an explanation of its reasons for reaching a different result”
 
 (id.,
 
 at 585). This appeal ensued.
 

 II
 

 The Legislature’s stated purpose in enacting SEQRA was to "declare a state policy which will encourage productive and enjoyable harmony between [people and their] environment; to promote efforts which will prevent or eliminate damage to the environment and enhance human and community resources; and to enrich the understanding of the ecological systems, natural, human and community resources important to the people of the state” (ECL 8-0101). Thus, the primary purpose of SEQRA "is to inject environmental considerations directly into governmental decision making”
 
 (Matter of Coca-Cola Bottling Co. v Board of Estimate,
 
 72 NY2d 674, 679;
 
 see also, Akpan v Koch,
 
 75 NY2d 561, 569). In furtherance of that purpose, the information obtained by lead agencies through the SEQRA process enables State and local officials to intelligently "assess and weigh the environmental factors, along with social, economic and other relevant considerations in determining whether or not a project or activity should be approved or undertaken in the best over-all interest of the people of the State”
 
 (Matter of Town of Henrietta v Department of Envtl. Conservation,
 
 76 AD2d 215, 222; 1975 NY Legis Ann, at 438-439). SEQRA seeks to "strike a balance between social and economic goals and concerns about the environment”
 
 (Matter of Jackson v New York State Urban Dev. Corp.,
 
 
 *381
 
 67 NY2d 400, 414), by requiring an agency to engage in a systematic balancing analysis in every instance
 
 (Matter of Town of Henrietta v Department of Envtl. Conservation, supra,
 
 at 223). Aesthetic considerations are a proper area of concern in this balancing analysis inasmuch as the Legislature has declared that the "maintenance of a quality environment * * * that at all times is healthful and
 
 pleasing to the senses”
 
 is a matter of State-wide concern (ECL 8-0103 [1] [emphasis added];
 
 see also,
 
 ECL 8-0105 [6]).
 

 To achieve these purposes and goals, SEQRA imposes procedural and substantive requirements upon the agency charged with decision making in respect to proposed "actions”.
 
 [1]
 
 Whenever it is determined that a proposed "action” may have a significant effect on the environment, a DEIS is required to be prepared and various other procedural steps are to be taken including soliciting comments on the DEIS, holding public hearings when appropriate (ECL 8-0109, 8-0105 [7]; 6 NYCRR 617.8) and preparing and filing a FEIS in respect to which comments are solicited and any further appropriate public hearing held (6 NYCRR 617.10 [g]). In addition to the procedural requirements,
 
 [2]
 
 SEQRA imposes substantive requirements which include listing the various types of information that must be included in the EIS, a description of the proposed action with an assessment of its environmental impact and any unavoidable adverse environmental effects (ECL 8-0109 [2] [a]-[c]) and mitigation measures proposed to minimize the environmental impact (ECL 8-0109 [2] [f]).
 

 If an agency proposes to approve a project, it must consider the FEIS and prepare written findings that the requirements of SEQRA have been met (ECL 8-0109 [8]). It must also prepare a written statement of the facts and conclusions in the FEIS and comments relied upon and the social, economic and other factors and standards which form the basis of its decision (6 NYCRR 617.9 [c]). Put differently, the agency must take a sufficiently "hard look” at the proposal before making its final determination and must set forth a reasoned elaboration for its determination
 
 (see, Akpan v Koch,
 
 75 NY2d 561,
 
 *382
 
 570,
 
 supra; Matter of Jackson v New York State Urban Dev. Corp.,
 
 67 NY2d 400, 415-416,
 
 supra).
 
 Where an agency determines to reject a proposed project, it must likewise take a sufficiently "hard look” and set forth a reasoned elaboration for its determination
 
 (see, Matter of Jackson v New York State Urban Dev. Corp., supra,
 
 at 416). As we have only recently observed, "[a]n agency’s compliance with its substantive SEQRA obligations is governed by a rule of reason and the extent to which particular environmental factors are to be considered varies in accordance with the circumstances and nature of particular proposals”
 
 (Akpan v Koch,
 
 75 NY2d 561, 570,
 
 supra; see also, Matter of Jackson v New York State Urban Dev. Corp.,
 
 67 NY2d 400,
 
 supra).
 

 The Board stated that it rejected petitioner’s site plan because the plan "failed to adequately minimize or avoid adverse environmental effects to the maximum extent practicable” and because the "environmental effects revealed in the Environmental Impact Statement process can not be adequately minimized or avoided by the mitigation measures identified as practical.” The Board based its determination primarily upon the project’s failure to comply with various zoning requirements and the fact that the towers
 
 "may
 
 be visible [from the FDR homestead]” and that local property owners found the lighting objectionable.
 

 To the extent the Board’s determination is based upon the alleged failure of the plan to conform with various zoning regulations, we note, as did the Appellate Division, that except where the proposed action is a zoning amendment, SEQRA review may not serve as a vehicle for adjudicating "legal issues concerning compliance with local government zoning”
 
 (Matter of Town of Poughkeepsie v Flacke,
 
 84 AD2d 1, 5,
 
 lv denied
 
 57 NY2d 602). Indeed, ECL 8-0103 (6) specifically provides in pertinent part that "the provisions of this article do not change the jurisdiction between or among state agencies and public corporations”
 
 (see also, Matter of Town of Poughkeepsie v Flacke, supra;
 
 Gerrard, Ruzow, Weinberg, Environmental Impact Review in New York § 8.14, at 8-55). We assume, as did the Appellate Division, that the proposed WEOK project was a conforming use and conclude that alleged violations of the Lloyd Zoning Ordinance were not a valid basis for denying site plan approval pursuant to SEQRA.
 

 That is not to say that local zoning laws are irrelevant to determinations made pursuant to SEQRA. They are indeed
 
 *383
 
 relevant. For example, the inclusion of a permitted use in a local zoning ordinance is tantamount to a legislative finding that the permitted use is in harmony with the general zoning plan and will not adversely affect the local community
 
 (RPM Motors v Gulotta,
 
 88 AD2d 658). Thus, here, although by no means determinative, it should not be overlooked that the aesthetic visual impact of the towers, was, we presume, considered at the time that radio and television towers were included as permitted uses in the Designed Business zone
 
 (see, Matter of North Shore Steak House v Board of Appeals,
 
 30 NY2d 238, 243;
 
 RPM Motors v Gulotta, supra).
 

 Compliance with the zoning law aside, the question remains, however, whether the Board otherwise has made a reasoned elaboration resulting from its "hard look” pursuant to SEQRA review such that it can be concluded that its findings and determination are supported by substantial evidence.
 

 The often stated rule regarding our role in reviewing SEQRA determinations needs no extended discussion; it is not to weigh the desirability of any proposed action or to choose among alternatives and procedural requirements of SEQRA and the regulations implementing it
 
 (Matter of Village of Westbury v Department of Transp.,
 
 75 NY2d 62, 66), but to determine whether the agency took a "hard look” at the proposed project and made a "reasoned elaboration” of the basis for its determination
 
 (Matter of Jackson v New York State Urban Dev. Corp.,
 
 67 NY2d 400,
 
 supra).
 
 Where an agency fails to take the requisite hard look and make a reasoned elaboration, or its determination is affected by an error of law, or its decision was not rational, or is arbitrary and capricious or not supported by substantial evidence, the agency’s determination may be annulled
 
 (see,
 
 CPLR 7803 [3];
 
 Chinese Staff & Workers Assn. v City of New York,
 
 68 NY2d 359, 363;
 
 Matter of Jackson v New York State Urban Dev. Corp., supra; see generally,
 
 55 NY Jur 2d, Environmental Rights, § 65). Here, we conclude that the Board’s determination should be annulled because it is not supported by substantial evidence — substantial evidence being "such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact”
 
 (300 Gramatan Ave. Assocs. v State Div. of Human Rights,
 
 45 NY2d 176, 180) or " 'the kind of evidence on which responsible persons are accustomed to rely in serious affairs’ ”
 
 (People ex rel. Vega v Smith,
 
 66 NY2d 130, 139).
 

 
 *384
 
 Notwithstanding petitioner’s detailed Visual Impact Analysis which concluded that there would be no visual impact from the FDR site, the Planning Board determined that the towers
 
 might
 
 be visible from the FDR site. In so concluding, the Board relied on statements from some community members, agencies and other organizations, some of whom stated there
 
 might
 
 be a visual impact and others who stated that there definitely would be a visual impact. Critical to those views regarding visual impact from the FDR site was the supposition that the visual impact study was conducted under optimal conditions which impacted positively on the results of the study. Thus, the study was viewed as ambiguous and not establishing that under all conditions and at other times of the year, the condition of the foliage between the FDR site and the radio towers would be the same and would block the view from the FDR site; if the conditions and density of the foliage were less, there would be greater visibility of the towers. This reasoning is flawed, however, because the record demonstrates that at the time the visual impact study was conducted, there were
 
 no
 
 leaves on the trees. Thus, petitioner’s evidence of the visual impact from the FDR site was based on observations made under the
 
 least
 
 desirable conditions — when visibility of a tower radio transmitting facility would be greatest. Moreover, the comments and statements from community members and agencies do not appear to be supported by any factual data and at best are mere conjecture. Respondent’s finding that there
 
 may
 
 be a visual impact from the FDR homestead is unsupported by any factual data, scientific authority or any explanatory information such as would constitute substantial evidence. Thus, respondent’s conclusory finding that there would be an unacceptable negative aesthetic impact from the FDR viewpoint cannot be deemed a "reasoned elaboration” of its determination
 
 (see, Matter of Tehan v Scrivani,
 
 97 AD2d 769, 771).
 

 Although a particular kind or quantum of "expert” evidence is not necessary in every case to support an agency’s SEQRA determination, here, the record contains no factual evidence, expert or otherwise, to counter the extensive factual evidence submitted by petitioner. To permit SEQRA determinations to be based on no more than generalized, speculative comments and opinions of local residents and other agencies, would authorize agencies conducting SEQRA reviews to exercise unbridled discretion in making their determinations and
 
 *385
 
 would not fulfill SEQRA’s mandate that a balance be struck between social and economic goals and concerns about the environment
 
 (see, Matter of Jackson v New York State Urban Dev. Corp., supra).
 
 Nor could it be said that such a determination accords with "a rule of reason”
 
 (see, Akpan v Koch, supra).
 
 As one commentator has noted, "decision makers must not be given the freedom to either ignore or disregard the information that the environmental review process was designed to elicit if the process is to have any meaning” (Gitlen,
 
 The Substantive Impact of the SEQRA,
 
 46 Albany L Rev 1241, 1253).
 

 We do not intend to diminish in any way the importance of public comment with respect to any proposed site plan; SEQRA is designed to encourage public participation in the review process (ECL 8-0109 [4]-[6]). However, generalized community objections such as those offered here in response to the comprehensive data provided by petitioner, cannot, alone, constitute substantial evidence, especially in circumstances where there was ample opportunity for respondent to have produced reliable, contrary evidence
 
 (see, Matter of North Shore Steak House v Board of Appeals,
 
 30 NY2d 238, 245,
 
 supra; Matter of Veysey v Zoning Bd. of Appeals,
 
 154 AD2d 819,
 
 lv denied
 
 75 NY2d 708;
 
 Syracuse Bros. v Darcy,
 
 127 AD2d 588).
 

 We reject petitioner’s contention that negative aesthetic impact factors may not constitute a sufficient basis upon which SEQRA determinations may be made. Indeed, as we noted earlier, aesthetic impact considerations may constitute an important factor in SEQRA review. Negative aesthetic impact considerations, alone, however, unsupported by substantial evidence, may not serve as a basis for denying approval of a proposed "action” pursuant to SEQRA review.
 

 In view of our holding that respondent’s determination was not supported by substantial evidence, we find no need to address petitioner’s remaining arguments, including its contention regarding the Walker Tower. Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Wachtler and Judges Kaye, Titone, Hancock, Jr., and Bellacosa concur; Judge Simons taking no part.
 

 Order affirmed, with costs.
 

 [1]
 

 . "Actions” are of various types and include "projects or activities directly undertaken by any agency * * * or projects or activities involving the issuance to a person of a lease, permit, license, certificate or other entitlement for use or permission to act by one or more agencies; [and] policy, regulations, and procedure-making” (ECL 8-0105 [4]).
 

 [2]
 

 . No issue is raised on this appeal as to full compliance by the Board with the procedural requirements of SEQRA.